## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JESSICA MOORE**,** individually and on behalf of all others similarly situated, | : | **Case No.** |
| | : | |
| Plaintiff, | : | **Demand for Jury Trial** |
| | : | |
| v. | : | |
| | : | |
| GERBER PRODUCTS COMPANY (d/b/a Nestlé Nutrition, Nestlé Infant Nutrition, or Nestlé Nutrition North America), | : | |
| | : | |
| Defendant. | : | |

## CLASS ACTION COMPLAINT

Plaintiff Jessica Moore, on behalf of herself and all others similarly situated, by her undersigned attorneys, bring this Class Action Complaint against Defendant, GERBER PRODUCTS COMPANY (d/b/a Nestlé Nutrition, Nestlé Infant Nutrition, or Nestlé Nutrition North America) (hereinafter "Gerber"), for its negligent, reckless, and/or intentional practice of misrepresenting and failing to fully disclose the presence of toxic metals in its baby food products sold throughout the United States.  Plaintiff seeks both injunctive and monetary relief on behalf of the proposed Class (defined below), including requiring full disclosure of all such substances in Defendant's marketing, advertising, and labeling and restoring monies to the members of the proposed Class.  Plaintiff alleges the following based upon personal knowledge as to herself and her own actions, and, as to all other matters, allege, upon information and belief and investigation of their counsel.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## INTRODUCTION

1.      This is a consumer class action brought individually by Plaintiff and on behalf of all persons in the proposed Class and subclass defined below, all of whom purchased one or more baby food products manufactured by Gerber.[1]

2.      Gerber is an American manufacturer of Baby Food Products. Gerber claims to be one of the "world's most trusted name in baby food."
http://www.gerber.com/nestle_nutrition/default.aspx.  Gerber sells nearly 200 different baby food products in 80 countries, with product labels in 16 different languages.  Gerber was founded with the mission to "give babies the best start in life."  http://www.gerber.com/about-us.  As of 2017, Gerber controlled 61 percent of the baby food market in the United States.  *See "Growing Up Gerber: 5 Questions with CMO Aileen Stocks."*
https://www.brandchannel.com/2017/04/15/5-questions-gerber-041517/  (April 15, 2017).

3.      Parents like Plaintiff trust manufacturers like Defendant Gerber to sell baby food that is safe, nutritious, and free from harmful toxins, contaminants and chemicals.  Parents purchase Baby Food Products with the expectation that they are free from heavy metals, substances known to have significant, harmful health effects.

4.      Because consumers do not have the scientific knowledge necessary to determine whether the Baby Food Products contain heavy metals or to know or ascertain the true nature of the ingredients in the Baby Food Products, they must rely on Defendant to honestly report the contents of its products.

---

[1] The Gerber baby food products purchased by Plaintiff are: Gerber Rice Single Grain Cereal, Geber Oatmeal Single Grain Cereal, Gerber Natural Carrot, Gerber Natural Apple Strawberry Banana with Vitamin C, and Gerber Natural Banana Blueberry with Vitamin C (collectively referred to herein as the "Baby Food Products").

5.      On February 4, 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, released the results of an investigation into leading baby food manufacturers in the United States relating to alleged high amounts of detrimental metals in baby food.  The Subcommittee Report (defined below) revealed that "[i]nternal company standards permit dangerously high levels of toxic heavy metals, and … that the manufacturers have often sold foods that exceeded those levels."  Subcommittee Report at 4.

6.      Heavy metals are not listed as an ingredient on the product labels of the Baby Food Products.  Nor do the labels warn of the potential presence of heavy metals in the Baby Food Products.  Unbeknownst to Plaintiff and other members of the proposed Class and subclass, and contrary to the representations on the product labels, the Baby Food Products contain toxic heavy metals, including inorganic arsenic, lead, cadmium, and mercury, at levels above what is considered safe for babies.  Had the presence of these heavy metals had been disclosed to Plaintiff and the members of the proposed Class and subclass prior to purchase of the Baby Food Products, they would not have purchased or consumed the Baby Food Products.

7.      Defendant knows that its customers trust the quality of its baby food products and that these customers expect Defendant's products to be free of harmful ingredients such as heavy metals.  Gerber is also aware that many consumers seek out and purchase premium baby foods that contain high quality ingredients, free of toxins, contaminants or chemicals and that these consumers will pay more for baby foods that they believe possess these qualities.

8.      Defendant's promises, warranties, pricing, statements, claims, packaging, labeling, marketing and advertising center on representations that are intended to, and do, convey

to consumers that their products, including their Baby Food Products, possess certain qualities and characteristics.

9.      No reasonable consumer seeing Defendant's marketing and labeling would expect the Baby Food Products to contain heavy metals or other contaminants.  Reasonable consumers, like Plaintiff, would consider the inclusion of heavy metals or other toxins or contaminants a material fact when considering what baby food products to purchase.

10.      Defendant intended for consumers like Plaintiff to rely on its marketing, and reasonable consumers did rely on Gerber's marketing.  As detailed herein, because the Baby Food Products contained undisclosed toxins, contaminants, and/or heavy metals, the Baby Food Products' labeling and marketing is deceptive, misleading, unfair and/or false.

11.      Defendant's Baby Food Products do not have a disclaimer or warning that the items may contain heavy metals or other undesirable toxins or contaminants that can accumulate in a child's body over time and cause deleterious effects.

12.      Defendant's wrongful marketing and advertising, which includes misleading, deceptive, unfair, and false marketing and omissions, allowed the company to capitalize on, and reap enormous profits from, consumers who paid the purchase price or a premium price for the Baby Food Products that were not sold as advertised.  Defendant continues to wrongfully induce consumers to purchase its Baby Food Products are not as advertised.

13.      Plaintiff and the members of the proposed Class and subclass thus brings claims for consumer fraud and seek damages, injunctive and declaratory relief, interest, costs, and attorneys' fees.

## THE PARTIES

14.     Plaintiff Jessica Moore is, and at all relevant times hereto has been, a citizen of the State of Texas and is a member of the proposed class and subclass defined herein.  She purchased the Baby Food Products, including Gerber Rice Single Grain Cereal, Gerber Oatmeal Single Grain Cereal, Gerber Natural Carrot, Gerber Natural Apple Strawberry Banana with Vitamin C, and Gerber Natural Banana Blueberry with Vitamin C.  Plaintiff last purchased the Baby Food Products for her child from H-E-B Grocery Company, LP in Houston, Texas.   Prior to purchasing the Baby Food Products, Plaintiff Moore saw Defendant's nutritional claims, upon which she relied in deciding to purchase these products.

15.     Plaintiff believed she was feeding her children healthy, nutritious foods during the time Plaintiff purchased and fed her children the Baby Food Products.  Due to the false and misleading claims and omissions by Defendant as described herein, Plaintiff was unaware that the Baby Food Products contained any level of toxic heavy metals, and Plaintiff would not have purchased the food if that information had been fully disclosed.

16.     As a result of Defendant's negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured when she paid the purchase price or a price premium for the Baby Food Products that did not deliver what they promised.  Plaintiff paid the purchase price with the assumption that the labeling of the Baby Food Products was accurate and that it was free of heavy metals and safe for children to ingest.  Plaintiff would not have paid this money had she known that the Baby Food Products contained excessive levels of heavy metals.

17.     Defendant Gerber Products Company, which also does business as Nestlé Nutrition, Nestlé Infant Nutrition, or Nestlé Nutrition North America, is a Michigan corporation with its principal place of business located in Florham Park, New Jersey.  Gerber began making

pre-prepared baby food in 1928.  Gerber was purchased by Nestlé in 2007.  It is currently the market leader for infant foods in the United States.

https://www.nestle.com/aboutus/history/nestle-company-history/gerber.  Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells its Baby Food Products throughout the United States.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2) because the claims of the proposed members of the Classes exceed $5,000,000 and because Defendant is a citizen of a different state than most of the members of the proposed Classes.

19.     This Court has personal jurisdiction over Defendant because Defendant regularly sells and markets its Baby Food Products in this District, and because Defendant otherwise conducts business in this District and/or under the stream of commerce doctrine by allowing its products, including the Baby Food Products, to be sold in this District.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events complained of herein took place in this District, and this Court has jurisdiction over Defendant.  Defendant has intentionally availed itself of the laws and markets of this District, and Defendant is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

21.      Defendant manufactures, distributes, markets, offers for sale and sells the Baby Food Products throughout the United States, including in this District.  Defendant has advertised and continues to advertise these products via television, print advertisements, point-of-sale

displays, product packaging, Internet advertisements including on social media, as well as other promotional materials.

22.     The United States House of Representatives Subcommittee on Economic and Consumer Policy published a report on February 4, 2021, revealing its findings that numerous commercial baby foods, including those manufactured by Defendant, are "tainted with significant levels of toxic heavy metals, including arsenic, lead, cadmium, and mercury."  *See* U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Staff Report, "Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium and Mercury (Feb. 4, 2021) (the "Subcommittee Report").  Congressional investigators examined a wide range of baby foods including rice cereals, purees, puffs and juices.  The Subcommittee Report found that organic products were as likely as conventional products to contain heavy metals.  Subcommittee Report at 9.

23.     Though heavy metals are naturally found in the environment, most heavy metals in foods come from contaminated soil or water.  The contamination comes from either farming or manufacturing practices, such as the use of pesticides, mining, and smelting or pollution.

24.     Defendant was one of the seven largest baby food manufacturers in the United States from whom the Subcommittee requested internal documents and test results.  Gerber responded to the requests and produced internal testing policies and results for ingredients and/or finished products.  Subcommittee Report at 2.

25.     The Subcommittee Report found that baby food companies such as Gerber regularly sell products that contain ingredients that exceed their own internal standards for heavy metals.  Subcommittee Report at 33. According to the Subcommittee Report, most baby food

companies do not regularly test the products before they go to market, and when they do, products with high levels of heavy metals are still sold.

26.     Representative Raja Krishnamoorthj, chairman of the Subcommittee, told Consumer Reports that there are "dangerous levels of toxic metals in baby foods, and the levels far exceed what experts and governing bodies says is permissible.  Left to their own devices, baby food makers have set testing standards in excess of what recommended standards are, and even then, they often violate their standards."

27.     The Subcommittee Report provides evidence that baby food companies such as Defendant are not doing enough to reduce risk from exposure to these heavy metals, and that parts of the manufacturing process, including the addition of vitamins and mineral mixes, may be contributing to the high levels of these metals in the Baby Food Products.  The Subcommittee Report concluded that "These toxic heavy metals [in baby foods] pose serious health risks to babies and toddlers.  Manufacturers knowingly sell these products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever."  Subcommittee Report at 1.

28.     A representative for Gerber said in its response to the Subcommittee Report that the elements in question occurred naturally in the soil and water in which crops are grown and Gerber took multiple steps "to minimize their presence."  Under the FAQs section (https://www.gerber.com/learning-center/quality-safety-faqs), in response to the Subcommittee Report and other media stories, Defendant stated "Gerber baby foods are absolutely safe and healthy for your baby and comply with all FDA requirements. Metals are naturally found in soil and water and can become part of fruits, vegetables, and grains as they grow. … Gerber takes

many steps to keep levels as low as possible - starting with how our trusted farmers grow our crops."

29.     The FAQs further state that Gerber has "among the strictest standards in the world" for food safety and that feeding a variety of nutrient dense foods "is the best way to lower risk of heavy metals in your baby's diet."

30.     However, Defendant only cursorily describes its standards and how it minimizes the levels of these heavy metals.  The website merely states "Gerber foods must pass more than 100 individual quality checks before they can be sold.  These checks occur at 5 different stages…On top of that Gerber follows an annual testing plan featuring regular safety tests of finished products."  *See* https://www.gerber.com/learning-center/quality-safety-faqs.

**Defendant Falsely Marketed Its Baby Food Products**

31.     Defendant packages, labels, markets, advertises, manufactures, distributes, and sells its Baby Food Products throughout the United States, including in this District.  Defendant's market the Baby Food Products as healthy and omit any mention of heavy metals.

32.     Defendant's advertise that the "Gerber standard is a higher standard" and that the company is "committed to feeding generations of babies the highest quality food.  We only select the best of what nature has to offer."  Defendant touts its commitment to safety, claiming it "meet[s] the standards of the FDA" and "go further.  We have among the strictest standards in the world."

33.     Based on Defendant's decision to advertise, label, and market its Baby Food Products as healthy, safe and high quality, Defendant had a duty to ensure that these statements were true and not misleading.  As such, Defendant knew or should have known that the Baby

Food Products included nondisclosed levels of toxic, heavy metals, and that these toxins accumulate in the body over time.

34.     The marketing of the Baby Food Products also fails to disclose that the products contain or may contain any level of heavy metals or other undesirable toxins or contaminations. Defendant intentionally omitted this in order to induce and mislead reasonable consumers like Plaintiff to purchase the Baby Food Products.

35.     As a result of Defendant's omissions, a reasonable consumer would have no reason to suspect the presence of heavy metals in the Baby Food Products without conducting his or her own scientific tests or reviewing third party scientific testing of these products.

**Defendant Misled and Deceived Consumers**

36.     Defendant's marketing of its Baby Food Products wrongfully conveys to consumers like Plaintiff that these foods have certain superior quality and characteristics that they do not actually possess.

37.     For example, Defendant misleadingly caused Plaintiff and other consumers to believe that its Baby Food Products do not contain heavy metals through its marketing and omissions, which is material information to a reasonable consumer.

38.     Defendant's marketing wrongfully fails to disclose to Plaintiff and consumers the presence of heavy metals in its Baby Food Products.

39.     Based on Defendant's marketing, a reasonable consumer would not suspect the presence of heavy metals, nor would a reasonable consumer be able to detect these metals in the Baby Food Products without conducting his or her own scientific testing or reviewing scientific testing conducted on these products.

40.     Reasonable consumers must and do rely on Defendant to honestly report what is in the Baby Food Products.

41.     In light of Defendant's marketing, including its commitment to "higher standards", Defendant knew or should have known that the Baby Food Products contained heavy metals.

42.     Defendant intended for consumers to rely on its marketing, and reasonable consumers did in fact so rely.

43.     Defendant had a duty to ensure that the Baby Food Products were as they were represented, and not deceptively, misleadingly, unfairly, or falsely marketed.

44.     As a result of the foregoing, Defendant's marketing is deceptive, misleading, unfair and false to Plaintiff and other consumers of baby food, including under the consumer protection laws of the Texas.

45.     Defendant acted negligently, reckless, unfairly, and/or intentionally with its deceptive, misleading, unfair, and false marketing and omissions as described herein.

**Defendant's Marketing and Omissions are Misleading**

46.     At all times herein, Defendant knew or should have known that the Baby Food Products contained heavy metals and were not sufficiently tested for the presence of these metals.

47.     Defendant knew that heavy metals are a potentially dangerous contaminant that poses health risks to humans, and particularly to babies and children.

48.     The Baby Food Products had a risk of containing heavy metals due to Defendant's failure to monitor for their presence in the ingredients and finished products. Defendant was aware of this risk and failed to disclose it to Plaintiff and the Class.

49.     Defendant knew or should have known that it owned consumers a duty of care to prevent, or at the very least, to minimize the presence of heavy metals in the Baby Food Products to the extent reasonably possible.

50.     Defendant knew or should have known it owed consumers a duty of care to adequately test for heavy metals in Baby Food Products.

51.     Defendant knew consumers purchased the Baby Food Products based on the reasonable expectation that Defendant manufactured the Baby Food Products to the highest standards.  Based on this expectation, Defendant knew or should have known consumers reasonably inferred that Defendant would hold the Baby Food Products to the highest standard.

**Heavy Metals Exceed Safe Limits**

52.     Arsenic, lead, cadmium, and mercury are toxic heavy metals.  The U.S. Food and Drug Administration (the "FDA") and the World Health Administration (the "WHO") have declared these heavy metals to be dangerous to human health, especially to babies and children. Subcommittee Report at 2.

53.     Exposure to heavy metals in food can be harmful babies' neurological development and long-term brain function.   Even exposure to low levels of these metals can lead to serious and potentially irreversible damage to brain development.  *Id.*  Babies may be more susceptible to levels of toxins and substances as they are in the critical years of brain growth and development.  According to James Dickerson, PhD, chief scientific officer for Consumer Reports "[e]xposure to heavy metals has a disproportionate adverse effect on developing minds and bodies."   Dickerson said that exposure to these metals has "deleterious effects on the developing infant mind, brain, cardiovascular system, and immune system" and

can lead to a lower IQ or behavioral problems like ADHD, as well as an increased risk of skin and bladder cancer.

      **a.**     **Arsenic**

54.      Arsenic is an odorless and tasteless element that does not degrade or disappear.  It occurs in the environment and can be found in rocks, soil, water, air, plants, and animals. Inorganic arsenic is highly toxic and a known cause of human cancers.  Exposure to arsenic can also cause respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, and damage to children's central nervous systems and cognitive development.  Subcommittee Report.

55.      Because of the risks associated with exposure to arsenic, both the FDA and the Environmental Protection Agency (the "EPA") have set limits for the allowable amount of arsenic in baby foods, including formula and juices, as well as for drinking water.  The allowable limit of arsenic is 10 part per billion ("ppb") for human in consumption in apple juice (regulated by the FDA) and drinking water (regulated by the EPA).

56.      In August 2020, the FDA set a limit for inorganic arsenic in infant rice cereal at 100 ppb.  According to the Subcommittee Report, one quarter of the baby food products tested by the Nurture company contained more than this level; some ingredients used by Beech-Nut tested as high as 913 ppb, and Gerber used at least 67 batches of rice flour testing more than 90 ppb inorganic arsenic.

57.      While Gerber did not provide inorganic arsenic results for all of its ingredients, test results for conventional rice flour revealed that Gerber routinely used flour with over 90 ppb inorganic arsenic.  Also, Gerber used five batches of rice flour that had 98 ppb inorganic arsenic, and 67 batches that contained more than 90 ppb.  Subcommittee Report at 19.

b.    **Cadmium**

58.    Exposure to cadmium is associated with decreases in IQ and the development of ADHD.  The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA likewise determined that cadmium is a probable human carcinogen.  It has been specifically noted that "[k]idney and bone effects have…been observed in laboratory animals ingesting cadmium."

59.    There has been some regulation on the use of cadmium outside of the baby food realm, with the EPA setting a limit of 5 ppb in drinking water and the FDA setting a limit of 5 ppb in drinking water.  *See* Subcommittee Report at 29.  The WHO has set a limit of 3 ppb for cadmium in drinking water.  Moreover, organizations like Healthy Babies Bright Futures have set a goal of no measurable cadmium in baby food and Consumer Reports has called for a 1 ppb cadmium limit in fruit juices.  *Id*.  The EU has set a limit ranging from 5-20 ppb cadmium in baby formula.

60.    The Subcommittee Report found that baby food manufacturers, including Gerber, sold many baby food products that exceeded these limits.

61.    Gerber does not test all of its product ingredients for cadmium.  Of those it does test, it accepts ingredients with levels of this metal.  Gerber used multiple batches of carrots containing as much as 87 ppb cadmium, and 75% of the carrots Gerber used had more than 5 ppb cadmium.  Subcommittee Report at 32.

c.    **Lead**

62.    Lead is persistent, and it can bioaccumulate in the body over time.[2]  It is a carcinogen and developmental toxin known to cause health and developmental problems in

---

[2] *See* https://www.espa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.

children including decreased cognitive performance, delayed puberty, and reduced postnatal growth.  Because lead can build up in the body over time, even low levels of chronic exposure can be toxic and seriously dangerous to one's health.

63.     The American Academy for Pediatrics, the Environmental Defense Fund, and Consumer Reports have all called for a 1 ppb level of lead in food and drinks that babies and children consume. Subcommittee Report at 21. While there is no lead standard for lead in baby foods, but the FDA standard for lead in bottled water is 5 ppb lead.  *See* 21 C.F.R. § 165.110(b)(4)(iii)A).

64.     The Subcommittee Report found that Gerber used an ingredient, conventional sweet potatoes, with 48 ppb lead.  Gerber also used twelve other batches of sweet potato that tested over 20 ppb for lead, maxim lead level in infant formula allowed by the European Union.  *See* Subcommittee Report at 21.  The tables detail data excerpted from Gerber detail lead levels in baby foods and juices. Subcommittee Report (at 28).

| Ingredient | Lead Level (ppb) |
|---|---|
| Conventional | 48 |
| Organic | 35 |
| Organic | 34 |
| Organic | 34 |
| Conventional | 34 |
| Conventional | 34 |
| Conventional | 34 |
| Organic | 25 |
| Organic | 25 |
| Organic | 22 |

| Organic | 22 |
|---|---|
| Organic | 21 |
| Conventional | 21 |

| Ingredient | Lead (ppb) |
|---|---|
| Grape Juice White 68 Bx Asp Tote AR InfG | 29 |
| Grape Juice White 68 Bx Asp Tote AR InfG | 26 |
| Grape Juice White 68 Bx Asp Tote AR InfG | 25 |

65.      The average amount of lead in Gerber's tested juice concentrates was 11.2 ppb –
more than 10 times the FDA's limit for lead in bottled water.  Over 83% of the juice concentrates
tested showed greater than 1 ppb, which is Consumer Reports' recommended limit for fruit
juices.  *See* Subcommittee Report at 28.  The results for the sweet potatoes and juices
demonstrated Gerber's willingness to use ingredients containing dangerous levels of lead.

**d.      Mercury**

66.      Mercury is a known toxin, and pre-natal exposure has been associated with
affected neuro-development, a decreased IQ, and autistic behaviors.  The impact of mercury
exposure to humans and animals has been studied for years; as early as 1997, the EPA issued a
report to Congress that detailed the health risks to humans and animals.  Because of these risks
and mercury's toxicity, both state and federal regulators have enacted regulations to protect
humans and animals.

67.      There has been some regulation of mercury outside the baby food context. For
example, the EPA has capped mercury in drinking water a 2 ppb.  Consumer advocates have

urged for even stricter standards for baby food.  Health Babies Bright Futures has called for a

goal of *no* measurable mercury in baby food.  *See* Subcommittee Report at 32.

68.     Gerber rarely tests for mercury in its baby foods.  Of the test results they

presented to the Subcommittee, they only tested carrots, sweet potatoes, and lemon juice

concentrate. Gerber policy is to test only ingredients, and not its final products.  According to the

Subcommittee Report, this policy "recklessly endangers babies and children and prevents the

companies from ever knowing the full extent of the danger presented by their products."

Finished baby foods are more toxic than their ingredients alone.  This means that testing only

ingredients gives the false appearance of lower-than-actual toxic heavy metal levels.

69.     Based on the foregoing, reasonable consumers like Plaintiff, would consider the

inclusion of these toxic metals in a material fact when considering which baby food to purchase.

70.     Defendant knew that properly and sufficiently monitoring and testing for heavy

metals in its ingredients and Baby Food Products was critical.

71.     Finally, Defendant knew or should have known that it could control the levels of

heavy metals in the Baby Food Products by properly monitoring their ingredients for heavy

metals and adjusting any formulation or diet to reduce ingredients that contained higher levels of

heavy metals.

72.     Defendant also knew it was not properly and sufficiently testing for the presence

of heavy metals in the Baby Food Products.

73.     Defendant knew or should have known that consumers reasonably expected it to

test for and monitor the presence of heavy metals in the Baby Food Products and ingredients.

74.     Defendant knew, yet failed to disclose, its lack of regular testing and knowledge

of the risk or presence of heavy metals in the Baby Food Products.

75.     The statements, representations, partial disclosures, and omissions made by Defendant are crafted to deceive the public as they create an image that the Baby Food Products are healthy, nutritious, and made from the best ingredients, are subject to strict quality control, and are free of heavy metals.

76.     Reasonable consumers, such as Plaintiff and the Class members, would have no reason to doubt Defendant's statements regarding the quality of the Baby Food Products. Defendant's failure to disclose and/or concealment of the toxins in the Baby Food Products together with the misrepresentations alleged herein that were intended to, and did, cause consumers like Plaintiff to purchase products they otherwise would not have if the true quality and ingredients were disclosed.

77.     As a result of the wrongful marketing, including the misleading, deceptive, unfair and false representations and omissions, Defendant capitalized on and reaped enormous profits from consumers like Plaintiff who paid the purchase price or a premium for the Baby Food Products that were not as advertised.

**PLAINTIFF'S RELIANCE IS REASONABLE AND FORESEEABLE**

78.     Plaintiff reasonably relied on Defendant's claims, warranties, representations, advertisements, and other marketing concerning the qualities and benefits of the Baby Food Products.

79.     Plaintiff read and relied upon the labels and packaging of the Baby Food Products when making purchasing decisions.  Had Plaintiff known Defendant omitted the presence of toxic heavy metals from its packaging, Plaintiff would not have purchased the Baby Food Products.

80.     A reasonable consumer would consider the labeling of a product when deciding whether or not to purchase it.  Here, Plaintiff relied on the specific statements and omissions on the Baby Food Products' labeling that led her to believe it was healthy, nutritious, and free of heavy metals.

**DEFENDANT BREACHED ITS EXPRESSED AND IMPLIED WARRANTIES**

81.     Defendant had sufficient notice of its breaches of express and implied warranties. Defendant has, and had, exclusive knowledge of the physical and chemical properties of the Baby Food Products.  Moreover, Defendant was put on notice by the Healthy Babies Bright Future Report released in October 2019, regarding the inclusion of heavy metals or other toxins in the Baby Food Products.  *See*

https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf.

**PRIVITY EXISTS WITH PLAINTIFF AND THE PROPOSED CLASS**

82.     Defendant knew that consumers such as Plaintiff and the proposed members of the Class would be the end purchasers or users of the Baby Food Products and the target of its advertising and statements.

83.     Defendant intended the warranties, advertising, labeling, statements, and other representations would be considered by the end purchasers of the Baby Food Products, including Plaintiff and the proposed Class.

84.     Defendant directly marketed the Baby Food Products to Plaintiff and the proposed Class through statements on its website, labeling, advertising, and packaging on the Baby Food Products.

85. Plaintiff and the proposed Class are the intended beneficiaries of the expressed and implied warranties.

## CLASS ACTION ALLEGATIONS

86. Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure. Notwithstanding, at this time, Plaintiff brings this action and seek certification of the following proposed class:

> All persons within the United States who purchased and/or consumed the Baby Food Products for household or business use, and not for resale, within the applicable statute of limitations period (the "Class").

87. Plaintiff Moore brings this action individually and on behalf of the following Texas Sub-Class:

> All persons who are citizens of the State of Texas, who, purchased the Baby Food Products for household or business use and not for resale during any applicable statute of limitations period (the "Texas Sub-Class").

88. Excluded from the proposed Class is the Defendant, and any entities in which the Defendant has a controlling interest, the Defendant's agents, employees, and their legal representatives, any judge to whom this action is assigned to this matter and any member of such judge's staff and immediate family.

89. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

90. **Numerosity – Federal Rule of Civil Procedure 23(a)(1) --** The members of the Classes are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Classes number in the thousands to tens of thousands.  The number of

members in the Classes is presently unknown to Plaintiff but may be verified by Defendant's records.  Members of the Classes may be notified of the pendency of this action by mail, e-mail, Internet postings, and/or publication.

91.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3) –** Common questions of law and fact exist as to all members of the Classes and predominate over individual questions.  Such common questions of law or fact include, but are not limited to:

     **a.** Whether Defendant owed a duty of care;

     **b.** Whether Defendant knew or should have known that the Baby Food Products contained heavy metals;

     **c.** Whether the Baby Food Products contain dangerous levels of toxic heavy metals;

     **d.** Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Baby Food Products are deceptive;

     **e.** Whether Defendant's actions violate the state consumer fraud statutes identified below;

     **f.** Whether Defendant's actions constitute common law fraud;

     **g.** Whether Plaintiff and members of the Classes were damaged by Defendant's conduct as alleged herein;

     **h.** Whether Defendant was unjustly enriched at the expense of Plaintiff and the members of the Classes; and

     **i.** Whether Plaintiff and the members of the Classes are entitled to injunctive relief.

92.    **Typicality – Federal Rule of Civil Procedure 23(a)(3) –** The claims of the named Plaintiff are typical of the claims of the other members of the Class and the subclasses.

All members of the Classes were similarly injured by Defendant's conduct as described herein, and there are no defenses available to Defendant that are unique to Plaintiff or any particular Class members.

93.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4) –** Plaintiff is an adequate Class representative because her interests do no conflict with the interests of other Class members; she has retained class counsel competent to prosecute class actions and financially able to represent the Classes.

94.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class members as a whole.  In particular, Plaintiff seeks to certify a Class to enjoin Defendant from selling or otherwise distributing Baby Food Products until such time that Defendant can demonstrate to the Court's satisfaction that its baby foods are accurately labeled.

95.     **Superiority – Federal Rule of Civil Procedure 23(b)(3) –** A class action is superior to any other means of adjudication for this controversy.  It would be impracticable for members of the Classes to individually litigate their own claims against Defendant because the damages suffered by Plaintiff and members of the Classes are relatively small compared to the cost of individually litigating their claims.  A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

<u>**CAUSES OF ACTION**</u>
<u>**COUNT I**</u>
**Breach of Express Warranty Against Defendant on Behalf of the Class (or, alternatively, the Subclass)**

96.     Plaintiff incorporates by reference and realleges each and every allegation detailed above, as though fully set forth herein.

97.     Defendant marketed and sold the Baby Food Products into the stream of commerce with the intent that the Baby Food Products would be purchased by Plaintiff and the Class.

98.     Defendant expressly warranted, advertised, and represented to Plaintiff and the Class that the Baby Food Products are made from the "highest quality ingredients."

99.     Defendant made these express warranties regarding the Baby Food Products' quality, ingredients, and fitness for consumption in writing via its website, advertisements, and marketing materials, as well as on the labels and packaging of the products themselves. These express warranties became part of the basis of the bargain that Plaintiff and the Class entered into upon purchasing the Baby Food Products.

100.     Defendant's advertisements, warranties, and representations were made in connection with the sale of the Baby Food Products to Plaintiff and the Class. Plaintiff and the Class relied on Defendant's advertisements, warranties, and representations regarding the Baby Food Products in deciding whether to purchase Defendant's products.

101.     Defendant's Baby Food Products do not conform to its advertisements, warranties, and representations in that they:

    **a.**  Are not natural or suitable for consumption by human infants; and

    **b.**  Contain, or may contain, levels of certain heavy toxic metals.

102.    Defendant was on notice of this breach as Gerber was aware of the included heavy metals in the Baby Food Products and based on the investigation in the Healthy Babies Bright Futures report that showed its Baby Food Products as unhealthy.

103.    Privity exists because Defendant expressly warranted to Plaintiff and the Class through warranting, packaging, advertising, marketing, and labeling that the Baby Food Products were healthy, natural, and safe for consumption and by failing to make any mention of heavy metals and/or other contaminants.

104.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they purchase Baby Food Products that were worth less than the price they paid and they would not have purchased had they known of the risk and/or presence of heavy metals and /or other contaminants that do not conform to the products' labels, packaging and advertisements.

105.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's failure to deliver goods conforming to their express warranties and resulting breach.

<u>**COUNT II**</u>
**Breach of Implied Warranty of Merchantability Against Defendant on Behalf of the Class (or alternatively, the State Subclass)**

106.    Plaintiff incorporates by reference and realleges each and every allegation detailed above, as though fully set forth herein.

107.    Defendant is a merchant engaging in the sale of goods to Plaintiff and the Class.

108.    There was a sale of goods from Defendant to Plaintiff and the Class.

109.    At all times mentioned herein, Defendant manufactured or supplied the Baby Food Products, and prior to the time they were purchased by Plaintiff and the Class, Defendant

impliedly warranted to them that the Baby Food Products were of merchantable quality, fit for their ordinary use (consumption by babies), and conformed to the promises and affirmations of fact when they purchased the Baby Food Products.

110.    The Baby Food Products were not fit for their ordinary use, consumption by babies, and did not conform to Defendant's affirmations of fact and promises as they contained, or were at risk of containing, heavy metals, and/or unnatural or other ingredients or contaminants that do not conform to the packaging.

111.    Defendant breached its implied warranties by selling Baby Food Products that failed to conform to the promises or affirmations of fact made on the container or label as each product contained heavy metals, and/or unnatural or other ingredients or contaminants that do not conform to the packaging.

112.    Defendant was on notice of this breach, as it was aware of the heavy metals included, or at risk, in the Baby Food Products, and based on the public investigation by Healthy Babies Bright Futures that showed Defendant's baby food products as unhealthy and contaminated.

113.    Privity exists because Defendant impliedly warranted to Plaintiff and the Class through the warranting, packaging, advertising, marketing, and labeling that the Baby Food Products were natural, and suitable for consumption by babies, and by failing to make any mention of heavy metals, and/or unnatural or other ingredients.

114.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they have purchased Baby Food Products that are worth less than the price they paid and that they would not have purchased at all had they known of the presence or risk of heavy metals, and/or unnatural or other ingredients.

115.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's failure to deliver goods conforming to their implied warranties and resulting breach.

**COUNT III**

**Fraudulent Misrepresentation Against Defendant on Behalf of the Class (or, alternatively, the State Subclass)**

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    Defendant falsely represented to Plaintiff and the Class that their Baby Food Products are made from the "highest quality ingredients."

118.    Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase its Baby Food Products.

119.    Defendant knew that their representations about the Baby Food Products were false in that they contained, or were at risk of containing, levels of heavy metals, and/or other ingredients that do not conform to the products' labels, packaging, advertising, and statements. Defendant allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

120.    Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Baby Food Products to their detriment. Given the deceptive manner in which Defendant advertised, represented, and otherwise promoted these products, Plaintiff's and the Class's reliance on Defendant's misrepresentations was justifiable.

121.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they purchased Baby Food Products that were worth

26

less than the price they paid and that they would not have purchased at all had they known of the risk and/or presence of heavy metals, and/or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

122.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT IV
## Fraud by Omission Against Defendant on Behalf of the Class (or, alternatively, the State Subclass)

123.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.    Defendant concealed from and failed to disclose to Plaintiff and the Class that their Baby Food Products contained, or were at risk of containing, heavy metals, and/or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

125.    Defendant was under a duty to disclose to Plaintiff and the Class the true quality, characteristics, ingredients and suitability of the Baby Food Products because: (1) Defendant was in a superior position to know the true state of facts about its products; (2) Defendant was in a superior position to know the actual ingredients, characteristics, and suitability of the Baby Food Products for consumption by babies; and (3) Defendant knew that Plaintiff and the Class could not reasonably have been expected to learn or discover that the Baby Food Products were misrepresented in the packaging, labels, advertising, and websites prior to purchasing the Baby Food Products.

126.    The facts concealed or not disclosed by Defendant to Plaintiff and the Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Baby Food Products.

127.     Plaintiff and the Class justifiably relied on the Defendant's omissions to their detriment. The detriment is evident from the true quality, characteristics, and ingredients of the Baby Food Products, which is inferior when compared to how the Baby Food Products are advertised and represented by Defendant.

128.     As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they purchased Baby Food Products that were worth less than the price they paid and that they would not have purchased at all had they known of the risk and/or presence of heavy metals, or other ingredients that do not conform  to the products' labels, packaging, advertising, and statements.

129.     Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT V
### Negligent Misrepresentation Against Defendant on behalf of the Class (or, alternatively, the State Subclass)

130.     Plaintiff incorporates by reference and repeats and realleges all previously alleged paragraphs, as if fully alleged herein.

131.     Plaintiff reasonably placed her trust and reliance in Defendant's representations that the Baby Food Products were marketed to her and the Class, and were healthy, nutritious, made from the best ingredients, and safe for consumption and did not contain heavy metals.

132.     Because of the relationship between the parties, Defendant owed a duty to use reasonable care to impart correct and reliable disclosures concerning the presence of heavy metals in the Baby Food Products, or based upon its superior knowledge, having spoken, to say enough not to be misleading.

28

133.    Defendant breached its duty to Plaintiff and the Class by providing false, misleading, and/or deceptive information regarding the nature of the Baby Food Products.

134.    Plaintiff and the Class reasonably relied upon the information provided by Defendant.   A reasonable consumer would have relied on Defendant's own warranties, statements, representations, advertising, packaging, labeling, and other marketing as to the quality, make-up and ingredients of the Baby Food Products.

135.    As a result of the misrepresentations, Plaintiff and the Class purchased the Baby Food Products, and purchased them at a premium.

136.    Defendant failed to use reasonable care in its communications and representations to Plaintiff and the Class, especially in light of its knowledge of the risks and importance of considering ingredients to consumers when purchasing the Baby Food Products.

137.    By virtue of Defendant's negligent misrepresentations, Plaintiff and the Class have been damaged in an amount to be proven at trial, or alternatively, seek rescission and disgorgement under this Count.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of the Class, or alternatively, the State Subclass)**

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as if fully set forth herein.

139.    Plaintiff and putative Class Members conferred a benefit on Defendant when they purchased the Baby Food Products, of which Defendant had knowledge.  By its wrongful acts and omissions described herein, including selling the Baby Food Products, which contain toxic heavy metals, including arsenic, cadmium, mercury and lead, at levels above what is considered safe for babies and did not otherwise perform as represented or for the particular purpose for which they

were intended, Defendant was unjustly enriched at the expense of Plaintiff and putative Class members.  Plaintiff's detriment and Defendant's enrichment were related to and flowed from the wrongful conduct alleged in this Complaint.

140.   Defendant has profited from its unlawful, unfair, misleading and deceptive practices at the expense of Plaintiff and putative Class members under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit.  It would be inequitable for Defendant to retain the profits, benefits and other compensation obtained from its wrongful conduct as described herein in connection with selling the Baby Food Products.

141.   Defendant has been unjustly enriched in retaining the revenue derived from the Class members' purchases of the Baby Food Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendant manufactured defective Baby Food Products , and misrepresented the nature of the Baby Food Products, misrepresented their ingredients, and knowingly marketed and promoted dangerous and defective products which caused injuries to Plaintiff and the Class because they would not have purchased the products based on the same representations if the true facts concerning the Baby Food Products had been known.

142.   Plaintiff and putative Class members have been damaged as a direct and proximate result of Defendant's unjust enrichment because they would not have purchased the Baby Food Products on the same terms or for the same price had they known the true nature of the Baby Food Products and the misstatements regarding what the Baby Food Products were and what they contained.

143.   Defendant either knew or should have known that payments rendered by Plaintiff or putative Class members were given or received with the expectation that the Baby Food

Products were made from "the highest quality ingredients," as represented by Defendant in advertising, on Defendant's websites, and on the Baby Food Product's labels and packaging. It is inequitable for Defendant to retain the benefit of payments under these circumstances.

144. Plaintiff and putative Class Members are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant.

145. When required Plaintiff and putative Class Members are in privity with Defendant because Defendant's sale of the Baby Food Products was either direct or through authorized sellers. Purchase through authorized sellers is sufficient to create such privity because such authorized sellers are Defendant's agents for the purpose of the same of the Baby Food Products.

146. As a direct and proximate result of Defendant's wrongful conduct, and unjust enrichment, Plaintiff and putative Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructful trust upon profits, benefits and other compensation obtained by Defendant for its inequitable and unlawful conduct.

### COUNT VII
**Violation of Texas Deceptive Trade Practices Consumer Protecdtion Act, Tex. Bus. & Com. Code. Ann. §§17.41, *et seq.***
**(On behalf of the Texas Subclass)**

147. Plaintiff Moore, individually and on behalf of the Texas Subclass repeats and realleges each and every allegation above, as though fully set forth herein.

148. Defendant is a "person" as defined by Tex. Bus. & Com. Code Ann. § 17.45(3).

149. Plaintiff Moore and the members of the Subclass are "consumers," as defined by Tex. Bus. & Com. Code Ann. § 17.45(4).

150. Defendant advertised, offered, or sold goods or services in Texas, and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code Ann. § 17.45(6).

151.     Defendant engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code Ann. § 17.46(b) by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; representing that goods or services are of a particular standard, quality or grade, if they are of another; and advertising goods or services with the intent not to sell them as advertised.

152.     Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

153.     Defendant engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Defendant engaged in acts or practices which took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

154.     Consumers, including the Plaintiff Moore and Class members, lacked knowledge about the above business practices, omissions, and misrepresentations, because this information was known exclusively by Defendant.

155.     As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Moore and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Baby Food Products.

## PRAYER FOR RELIEF

156.     WHEREFORE, Plaintiff, individually and on behalf of the other members of the Classes proposed in this Complaint, respectfully requests that the Court enter judgment as follows:

A.  Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiff and Class Representatives, and appointing the undersigned counsel as Class Counsel for the Classes;

B.  An order enjoining Defendant from selling Baby Food Products until the higher and/or unsafe levels of heavy metals are removed;

C.  An order enjoining Defendant from selling Baby Food Products in any manner suggesting or implying that they are healthy, nutritious, and safe for consumption;

D.  An order requirinig Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

E.  Ordering Defendant to pay actual damages to Plaintiff and the other members of the Classes;

F.  Ordering Defendnt to pay restitution to Plaintiff and the other members of the Classes;

G.  Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Classes;

H.  Ordering Defendant to pay statutory damages, as provided by the applicable state consumer protection statutes invoked herein, to Plaintiff and the other members of the Classes;

I.  Ordering Defendant to pay reasonable attorneys' fees and litigation costs to Plaintiff and the other members of the Class as allowable by law;

J.  Ordering Defendant to pay both pre- and post-judgment interest as allowable by law, on any amounts awarded; and

K.  Ordering such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims in this Complaint so triable. Plaintiff also respectfully requests leave to amend this Complaint to conform to the evidence, if such amendment is needed for trial.

Dated: February 12, 2021

**Barrack, Rodos & Bacine**

s/ *Jeffrey B. Gittleman*
Jeffrey B. Gittleman
One Gateway Center, Suite 2600
Newark, NJ 07102
T: (973) 297–1484
F: (973) 297-1485
jgittleman@barrack.com
          and
Jeffrey A. Barrack
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
T:  (215) 963-0600
F:  (215) 963-0838
jbarrack@barrack.com
jpalley@barrack.com

John G. Emerson
**Emerson Firm, PLLC**
2500 Wilcrest, Suite 300
Houston, TX 77042
T: (800)-551-8649
F: (501)-286-4659
jemerson@emersonfirm.com

Christopher D. Jennings
(AR Bar No. 2006306)
**Johnson Firm**
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
T: (501) 372-1300
F: (888) 505-0909
chris@yourattorney.com

34